Superior Yarn Mills, Inc. v. Commissioner.
Superior Yarn Mills v. Commissioner
Docket No. 25327.
United States Tax Court
1954 Tax Ct. Memo LEXIS 257; 13 T.C.M. (CCH) 325; T.C.M. (RIA) 54099; March 31, 1954
David R. Shelton, Esq., and Aaron L. Ford, Esq., for the petitioner. E. M. Woolf, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves the following deficiencies in income and excess profits tax: Excess
Year
Income Tax
Profits Tax
1944
$ 287.52
$6,831.20
1945
29,424.52
505.20
1946
6,043.78
The issues are proper allowance for depreciation on property each year and the amount of loss sustained in 1945 on abandonment of assets. Alternative issues raised by an amendment to the petition are whether the amount of the cost of the assets in 1929, which was allegedly allocated by the respondent to water power rights, should (1) be allocated to hydro-electric generating facilities and held to constitute *258 petitioner's loss on abandonment of the property in 1945, or (2) allowed as a loss on account of complete worthlessness of the water rights. Petitioner is claiming an overpayment of excess profits tax in 1944 and of income tax in 1946. Findings of Fact The stipulated facts are so found. The petitioner is a North Carolina corporation. It filed its returns for the taxable years with the collector of internal revenue for the district of North Carolina. All of the stock of petitioner is owned by the Duke Power Company, a corporation engaged in the production, transmission and distribution of electrical energy, and other utility operations in the Piedmont section of North Carolina and South Carolina. On April 2, 1929, petitioner purchased for $500,000 cash, borrowed from the Duke Power Company, the Long Island plant of the Long Island Cotton Mills Company, located on the Catawba River at Long Island, North Carolina. The assets purchased included all mills, a dam, buildings, and other structures situated upon 565 acres of land on both sides of the Catawba River, water wheels, machinery apparatus, tools, trucks, stores, supplies, cotton stock in process, and yarn on hand, together *259 with all rights, privileges, easements, immunities and interests in the land. The buildings comprising the Long Island plant were constructed in and after 1893. Other structures consisted of 41 dwellings and miscellaneous buildings, most of which were erected in or after 1900. The dam was of concrete construction, except for about 100 feet of its length of 1,500 feet, and extended across the Catawba River. The dam was utilized in connection with the operation of water wheels to provide power for operating the mill. One of the wheels provided direct power for the operation of machinery in one of the buildings of the mill. The other wheels were used to drive dynamos for generating electricity for use in the plant. The dam and other facilities used to operate the water power plant were abandoned in 1945. The mill was equipped with numerous items of machinery and auxiliary equipment for producing cotton yarn from bales of cotton. The assets acquired in 1929 were entered on the general ledger of the petitioner in a lump sum as "Long Island Plant $500,000.00", and the entry so made has not been changed. The money borrowed to make the purchase, together with interest thereon, was *260 repaid in full out of earnings, the final payment having been made in 1939. On April 1, 1929, the Duke Power Company owned and operated six hydro-electric plants on the Catawba River, in North Carolina and South Carolina, four of which were upstream and two downstream from the Long Island plant. The plants were placed in operation at various times between 1915 and 1928. It operated two steam plants on the Catawba River in North Carolina south of the Long Island plant, one of which was placed in operation in 1913 and the other in 1929. Pursuant to an appraisal made in 1934 by George C. Bell, a consulting engineer and architect employed for that purpose, petitioner allocated, effective for the taxable year 1933, $243,592.28 of the purchase price to assets subject to depreciation, except for $2,600 allocated to "wells", and the remainder of $256,407.72 to "unclassified intangibles." The appraiser did not, in accordance with a request of petitioner, include any amount in the appraisal for the 565 acres of land, or for water rights. The allocation was used by the petitioner and accepted by the respondent for the years 1933 to 1944, inclusive, for claiming and allowing depreciation. *261 In 1945 the hydraulic facilities acquired in 1929 and thereafter, and other property became worthless, except for salvage value, and were abandoned by petitioner. During the same year it entered into an agreement to purchase its requirements of electrical power from the Duke Power Company. In 1945 petitioner increased the proportion of the price allocated to assets subject to depreciation by $239,907.92, which, with the sum of $16,500 allocated to the land and $2,600 previously allocated to "wells", was charged to the following accounts in the amounts shown: Machinery
$127,623.17
Mill buildings
37,941.50
Water and sewer lines
7,997.47
Village houses
31,262.29
Dam
20,500.63
Water wheel and jack shaft
17,182.66
Land
16,500.00 The basis for the write-up of the accounts was a conclusion of a tax consultant that of the purchase price of $500,000 paid on April 2, 1929, for the assets, $483,500 was allocable to exhaustible assets and the remainder of $16,500 to land. The petitioner claimed in its return for 1945 losses totaling $111,939.34, resulting from abandonment and sale of property acquired on April 2, 1929. The bases used by petitioner in computing *262 the losses were the amounts reflected by the books after the upward cost adjustments were made in 1945. In his determination of the deficiencies for 1945 respondent reduced the amount of the losses claimed to $52,890.43 by using as bases for the property the amounts shown by petitioner's books before it made the upward cost adjustments in 1945. Petitioner retained title to and possession of the 565 acres of land and the riparian rights in the land. In his determination of the deficiencies the respondent disallowed $1,488.65, $15,868.09 and $14,959.33 of the amounts claimed in 1944, 1945 and 1946, respectively, for depreciation. The exhaustible property acquired by petitioner on April 2, 1929, had a cost basis for income tax purposes 30 per cent in excess of the amounts set forth in the Bell appraisal. The so-called water rights in the 565 acres of land acquired on April 2, 1929, had considerable value at that time and in 1945. Opinion The primary issues involve proper allowances for depreciation in each of the taxable years and for alleged losses sustained in 1945 on abandonment of property. The difference between the parties is the cost basis for the assets. They agree *263 that the cost depends upon a proper allocation of the purchase price paid for the property in 1929 between depreciable and non-depreciable assets on the basis of values at that time. From 1933 to 1944, inclusive, deductions for depreciation were claimed by the petitioner and allowed by the respondent on the basis of costs set forth in an appraisal petitioner had an engineer make in February 1934. The appraiser, George C. Bell, found a total of $243,592.28 for assets subject to exhaustion, without, at petitioner's request, finding a value for the land and water rights. The remainder of $256,407.72 of the purchase price of $500,000 was allocated by petitioner to "unclassified intangibles." In 1945, when various hydraulic assets were abandoned after arrangements were made to purchase power theretofore furnished by the facilities, the amount on the books which had not been allocated to exhaustible assets was, except for $16,500 allocated to the 565 acres of land, charged on the books as cost in 1929 of machinery and other depreciable assets. The additional amounts so charged on the books reflected the conclusion of a tax consultant of petitioner. The evidence does not disclose the basis *264 for his conclusion. Deductions were claimed in returns on costs which reflected the upward adjustments made by the petitioner in 1945. Respondent refused to recognize the adjustments so made and recomputed the amounts of the deductions for loss, gain and depreciation on the basis of the cost figures used by petitioner prior to 1945 in accordance with the appraisal of Bell. The position taken by the petitioner at the hearing was that $483,500 of the purchase price should be allocated to depreciable assets and the remainder of $16,500 constituted its cost of the 565 acres of land, including the riparian rights. On brief petitioner contends that the evidence establishes that on April 2, 1929, the water rights had no value, that the 565 acres of land had a value of from $11,300 to $38,250, and that the other assets had values as follows: Water power construction
$ 97,202.14
Mill buildings and structures
80,458.20
Mill village buildings and structures
91,166.50
Electric generating equipment
18,681.45
Mill machinery and equipment
126,214.86
Total
$413,723.15 The values we are asked to accept were testified to by A. B. Hossack, one of petitioner's witnesses. *265 The position of respondent on brief is not only that no weight should be given to the evidence offered by petitioner, but that his evidence completely rebuts that of petitioner. The rebuttal evidence relied upon consists, in part, of testimony of Donald K. Woodard, who testified that the assets acquired in 1929 for $500,000 had a market value at that time of $137,000 based upon earnings, and of Willis G. Waldo, who testified that the water rights had a value of about $398,297, or $820,143, depending upon whether, after full development of the site, the power was sold for 8.583 or 11.65 mills per kwh. The effect of the position taken by petitioner is that the cost figure it consistently used and the respondent accepted for 12 years for depreciation purposes was understated by about $170,000, an amount equal to 34 per cent of the cost of the entire property, even though it was based upon an appraisal made by an engineer engaged by it for that purpose. Although the testimony of Waldo is to a value of not less than $398,297 for water rights, an intangible asset not subject to exhaustion, respondent has not requested a reduction in the cost of property subject to depreciation. In *266 1922, Francis R. Weller, a consulting engineer, estimated that the site could be fully developed by an expenditure of about $275,000 and that the investment would yield a gross return of $63,950 for power developed in excess of the requirements of the mill. In 1931 he considered the value of the site in 1913 at the request of the Long Island Cotton Mills Company and concluded that the water power had a value in 1913 of $413,433. Waldo agreed with that valuation in August 1931 after a review of the report of Weller. In 1932 Weller reviewed the report and concluded that the property had a like value in 1922 and 1929 and so informed the Long Island Cotton Mills Company. Waldo also agreed with that conclusion. The appraisal made by Bell in 1934 determined the value of the depreciable assets in 1929 on the basis of reproduction costs less depreciation from the year of acquisition to 1929. Bell treated some items of property as fully depreciated in 1929 and gave no value to them even though the assets were being used in the business. The Weller and Bell appraisals were before Hossack when he valued the property in 1951. Hossack, like Bell, used replacement costs in 1929 as a basis for *267 his valuations, but concluded that Bell had underestimated such costs of buildings by a total of about $200,000. Hossack estimated the useful life of property after 1951 and computed depreciation to 1929 to reduce reproduction cost to value based upon the ratio of expired life to 1929 to serviceable life. The method used by him resulted in some value for property still in use for which Bell assigned no value. Reproduction cost is not a reliable standard for establishing value, particularly when it is coupled, as it is here in the case of Hossack, with the application of 22 years of hindsight for exhaustion purposes. Frost Manufacturing Co., 13 B.T.A. 802, 808; Pittsburgh & West Virginia Railway Co., 30 B.T.A. 843, 851; section 59.08, Vol. 10A Mertens Law of Federal Income Taxation. Hossack concluded that the water power rights had no value. His reasoning was that the operating expenses of the facilities as they existed in 1929 exceeded an amount petitioner would have had to pay for its requirements of power from other sources, and the result so reached would not be different under full development of the site, whether petitioner sold all of the power *268 produced or only the amount in excess of the needs of its plant. The conclusion was reached with knowledge of the fact that the water rights were used until 1945, when petitioner commenced to purchase its requirements of electrical energy from the Duke Power Company, its sole stockholder. That history of use of the facilities implies that no saving would have been accomplished by purchasing electrical energy required by the mill. Witness Hossack regarded the difference of about $48,000 between his valuation and the amount of $500,000 which was actually paid in 1929 as an amount a willing purchaser would have paid to acquire a plant in operation. Other of his testimony is to the effect that the Duke Power Company probably financed the purchase of the property in order to control the existing water rights and not for the sole purpose of operating a cotton textile mill, a business having no direct connection with its primary business of generating and distributing electrical energy. Respondent, on brief, relies upon the lower of the two valuations placed upon the water rights by Waldo, his chief witness at the hearing. The amount of $398,297 as value we are asked to accept would, *269 with the amount of $243,592.28 accepted by the respondent as the value of exhaustible tangibles, exceed the actual purchase price of $500,000 for the entire business by about $142,000, exclusive of the land. In the absence of evidence on the negotiations involved in the purchase and sale in 1929, it is reasonable to assume that the price paid represents the fair market value of the entire property at that time. Other reasons appear for not giving full value to the opinion expressed by Waldo. His valuation is based upon development of the power available at the site by increasing the height of the dam from 9 feet to 17 feet to produce a certain amount of energy to sell at specified prices. The witness had not seen the property since 1930, and spent no more than four hours at the site at that time. Cost of transmission lines was not taken into account and the formulae he applied contemplated a market for the entire output but he knew of no buyers in 1929 for the energy. The flexible nature of his method of valuation is shown by his testimony that his ultimate finding of value would not be different if power could not be sold for more than 7 mills per kwh, and that he, like other engineers *270 considering a like question, did not "set up special figures which can be attacked." The business acquired in 1929 included cotton, stock in process, and yarn on hand. None of the witnesses gave consideration to any of such property. It is evident that an absurd result would be reached by blindly following the testimony by any one of the witnesses relied upon by the parties. Although acceptance by petitioner of the Bell appraisal made in 1934 and consistent use of the values therein for depreciation purposes until 1945 is subject to an inference that such amounts represented a fair allocation of the purchase price to exhaustible assets, respondent does not specifically contend that the course of conduct precludes petitioner from asserting, as it has here, higher values for costs. But the adoption of the appraisal for income tax purposes is a matter for consideration by us here. The appraisal contains defects operating against petitioner but not, in our opinion, in the amount alleged by it. The Bell report did not consider the value of the land or intangibles. There is no suggestion in the record as to what his opinion would have been if he had been required to allocate the value *271 of all of the property to the two classes of assets. It may not be assumed that such a task would not have altered his opinion on the values of the exhaustible assets. No reference was made in his report to any cotton, and goods in process and on hand at the time of the purchase. That he considered the water rights had value is shown by his valuation of the exhaustible assets at slightly less than one-half of the total cost. The condition of the record here on the value of the assets frequently occurs when experts on opposite sides testify on the point. The use of the figure of $243,592.28 by petitioner in computing income for 12 consecutive years is entitled to considerable weight, particularly because the values considered as cost were fixed and followed at times when the present loss deduction question was not present. It is only in rare instances that the value of property can be determined with great degree of certainty on the result. The situation here is such that no opinion can be more than an estimate, and no estimate is worth any more than its basis. As we have pointed out, the opinions relied upon here lack a firm foundation and are faulty for that reason. That the water *272 rights had value is shown by the interest the Duke Power Company had in the acquisition of the site by a wholly-owned subsidiary, and the uninterrupted use by petitioner of the power producing facilities for 16 years. That the Duke Power Company was aware of the cost to petitioner of electrical energy to operate the mill is obvious. The use of the facilities for power for the mill infers that such operation was less costly than purchased energy until 1945. It is obvious from the discussion made of the evidence that the cost to petitioner for tax purposes of depreciable tangibles was somewhat in excess of the original figure. How much more can not be determined with absolute accuracy. Our duty is to do the best we can with the evidence presented. Exercising our best judgment in the matter, and considering all of the evidence and the record as a whole, we conclude that the various items of depreciable property had a cost to petitioner of 30 per cent in excess of the amounts set forth in the Bell appraisal. The alternative issues advance two theories, both of which assume an allocation by respondent of the purchase price of water rights. Respondent accepted until 1945 the cost basis *273 claimed for depreciation purposes, and in 1945, when petitioner claimed a greater amount, he adjusted it to the original figure. The record is devoid of proof that the respondent actually allocated any part of the value of the two classes of property to the cost of water rights at any time. Under the first theory petitioner would have us assign an amount for value of the water rights to the hydroelectric generating facilities and treat it as a loss on abandonment of the power plant in 1945, and under the second, allow all of the amount as a loss upon the ground that the water rights became worthless in 1945. Each theory assumes that the water rights are something separate and distinct from the land. The parties stipulated that the hydraulic facilities became worthless, except for any salvage value, in 1945, and were abandoned. But there was no abandonment of the land or the water rights incident thereto. The right to use the riparian rights in the land continued after the hydraulic facilities were abandoned as worthless. Abandonment of the power plant means no more than that it was no longer profitable to so use the water rights. To conclude that the water rights became worthless *274 in 1945 we would have to ignore completely evidence in the record to the contrary. Thus, assuming that the water rights can be separated from the land for loss purposes, without proof of worthlessness, as alleged, there is no ground for allowing any amount as a deduction for loss. Decision will be entered under Rule 50.